UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

SHA-HEED RAHMAN, 90-A-0409,

                            Plaintiff,

                                                    DECISION AND ORDER
        -v-                                         04-CV-6368 CJS

GLENN S. GOORD, et. al.,

                            Defendants.

_____


APPEARANCES

For plaintiff:              Megan K. Dorritie, Esq.
                            Harter, Secrest & Emery LLP
                            1600 Bausch & Lomb Place
                            Rochester, New York 14604-2711

For defendants:             Andrew Cuomo
                            Attorney General of the State of New York
                            J. Richard Benitez, Esq.
                            Assistant Attorney General of Counsel
                            144 Exchange Boulevard, Suite 200
                            Rochester, New York 14614


INTRODUCTION

        This is an action in which the plaintiff, a Shi'ite Muslim prison inmate, is suing

officials of the New York State Department of Corrections ("DOCS") for alleged

violations of his right of religious freedom, pursuant to 42 U.S.C. § 1983 (First and

Fourteenth Amendments to the United States Constitution), the Religious Land Use and

Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq*., and the

Constitution of the State of New York.  Now before the Court is an application [#17] by

1

plaintiff for injunctive relief.  For the reasons that follow, the application is granted in part and denied in part.

BACKGROUND

In this lawsuit, plaintiff alleges that DOCS refuses "to recognize Shi'ite Islam as deserving of the rights and respect accorded other religions." (Second Amended Complaint [#45] ¶ 27) Instead, plaintiff contends that DOCS favors Sunni Islam over Shi'ite Islam, to the point that "DOCS has effectively established Sunni Islam as the official version of Islam within the New York State prison system." (Id. ¶ 26).  For example, he maintains that all Islamic religious services in DOCS facilities, including Friday Jumah services, are conducted according to the doctrines of Sunni Islam, and that DOCS recognizes Sunni Islam holy days, but does not recognize the Shi'ite holy days Eid-Ghadir, Muharram, or Ashura, and does not provide Shi'ite inmates with Halal food on these holy days. (Id. ¶ ¶ 20-59)  According to plaintiff, Eid-Ghadir is a three-day celebration of the prophet Muhammad's nomination of Ali as his successor, Muharram is a ten-day period of mourning in recognition of the death of Hussain, Muhammad's grandson, at the Battle of Karbala, and Ashura is a one-day observance consisting of "congregational prayer and quiet contemplation." ((Id. ¶ ¶ 41, 46, 51)  According to plaintiff, on these holy days Shi'ites are required to consume only Halal foods, which

> include milk, honey, fish, plants which are not intoxicant [sic], fresh or naturally frozen vegetables, fresh or dried fruits, legumes and nuts like peanuts, cashews, etc. and grains such as wheat and rice.  Certain animal meats may also be consumed if they are slaughtered according to Islamic Rites.

(Id. ¶ 56).

Plaintiff contends that DOCS forces Shi'ites to worship together with Sunnis at

2

Friday Jumah services, which is unacceptable to him, since "there are significant doctrinal differences between" the two sects, which originated with "a disagreement about the succession to the Prophet Mohammad upon his death." (Id. ¶ 22) Plaintiff maintains, in fact, that "Sunnis believe that Shi'ites are heretics and sinners," and that consequently, "there are often violent clashes between the two groups because of their doctrinal differences." (Id. ¶ 24) Plaintiff contends that "it is essential to . . . practice of the Shi'ite faith that he be allowed to participate in a Jumah prayer service, which takes place on Fridays," separate from Sunni Muslims.  Plaintiff contends that "a Shi'ite Muslim may not share the Jumah service with a Sunni Muslim because many of the Sunni Muslim rituals, prayers, and practices are antagonistic to the Shi'ite rituals, prayers, and practices and will actually invalidate Shi'ite prayrs." (Id. ¶ 33) Moreover, plaintiff contends that Jumah is a "congregational prayer," and that praying on his own is not an "acceptable alternative." (Id. ¶ ¶ 30, 34).

In the subject application, plaintiff seeks an injunction: 1) requiring DOCS to allow Shiite inmates to have their own Friday Jumah services, separate from Sunni inmates; 2) requiring DOCS to allow Shiite inmates to observe Shiite religious holidays; and 3) requiring DOCS to provide Halal religious meals to Shiites on such holidays.[1]

With regard to separate Jumah services, plaintiff reiterates, in an affidavit, that the Shiite faith does not permit Shiites to pray with Sunnis at Jumah services, and that separate Jumah services are "central" to his religious beliefs as a Shiite. (Pl. Aff. [#31-1]

---

[1]The original application for injunctive relief [#17] filed by plaintiff, proceeding pro se, contained additional requests for relief.  However, subsequent to the appointment of counsel, the request for injunctive relief was narrowed to these three points. *See*, Pl. Reply Memorandum [#32].

¶ 7)  Plaintiff acknowledges that, to avoid conflict, some Shiite inmates participate in

Jumah services with Sunnis or pray on their own. (Id. ¶ 10).  However, he insists that

neither option is acceptable to him.  With regard to the observance of religious holidays

and religious meals, plaintiff states that the religious holidays Eid-Ghadeer [or Eid-

Ghadir], Muharram, and Ashura are "especially important" to Shiites, and that they

require congregational prayer and fasting during the daytime, and the eating of Halal

meals after sundown. (Id. ¶ ¶ 11-13)  Plaintiff specifically states that Sunnis do not

observe either Eid-Ghadeer or Muharram, and that they "generally" do not celebrate

Ashura. (Id. ¶ ¶ 12, 15, 18) On the other hand, plaintiff asserts, "upon information and

belief", that "Sunni Muslims are allowed to participate in their designated religious

holidays and are provided Halal food without interference from DOCS." (Id. ¶ 22)

In support of his application, plaintiff submitted, *inter alia*, a document prepared

by DOCS entitled "Protocol for Shiite Muslim Programs and Practices" ("the Protocol")

[#31-3], which states that it "is intended to 'fine tune' the religious programming by

which Shi'ite Muslim inmates' religious practices and beliefs are to be more adequately

accommodated in accordance with the requirements and provisions of the

Department's Directive #4202 (Religious Programs and Practices)."  The Protocol

further states, in relevant part:

> Shi'ite Muslim inmates shall be afforded the full and equal opportunity to
> participate in, without discrimination, the weekly Friday Juma service for
> all Muslim inmates of a particular correctional facility.  Shi-ite Muslim
> Chaplains, whether they be employees or outside volunteers, shall be
> entitled to officiate at the weekly Juma services in the same manner as
> any other Muslim chaplain or outside volunteer Chaplains.
> ***
> The Department [DOCS] shall revise its Religious Observance Calendar .
> . . to include observances unique to Shi'ite Muslims, namely the

observances of Ashura, and the Id-ul-Ghadeer Khum.

(Protocol [#31-3] p. 4).  Plaintiff alleges that defendants are violating this protocol,

because all Muslim chaplains at DOCS facilities are Sunni, and because Shi'ites are

not allowed to observe Shi'ite holy days. (Second Amended Complaint [#45] ¶ ¶ 27, 37-

59)  Plaintiff further alleges that the Protocol itself is invalid, to the extent that it fails to

provide for a *separate* Shi'ite Juma service, since it violates the Order of the New York

State Supreme Court, Appellate Division, Second Department, in *Cancel v. Goord*, 278

A.D.2d 321, 323, 717 N.Y.S.2d 610, 612 (2d Dept. 2000) ("Accordingly, we . . . remit

the matter to DOCS to conduct administrative proceedings, with Shi'a participation, to

determine the manner in which to best afford Shi'a inmates separate religious services,

under appropriate Shi'a religious leadership, in a time and place that comport with

legitimate penological concerns.").[2]

Additionally, in support of his application, plaintiff has submitted an affidavit from

Dr. Liyakat Takim ("Takim"), Professor of Islamic Studies in the Department of Religious

Studies at the University of Denver, Colorado, whose "area of expertise is the Shi'ite

branch of Islamic doctrine." (Takim Aff. [#52-1] ¶ 2) Significantly, Takim asserts that:

> For the Jumah prayer to be valid for a Shi'ite, the leader of prayer must be
> mature, sane, Shi'ite, just and of legitimate birth.  Thus, a Sunni Imam is
> not recognized by Shi'ites as being qualified to lead Jumah prayer.  In
> fact, a Jumah prayer led by a Sunni Imam is insufficient to fulfill the
> obligations of a Shi'ite Muslim's faith.

(Id. ¶ 24).  Takim further states that, "providing Shi'ite Muslims the opportunity to

---

[2]Plaintiff's contention that the Second Department's decision in *Cancel v. Goord* requires separate Jumah services, while understandable, has been rejected by every court that has subsequently considered the issue, including the New York State Supreme Court to which the case was remanded by the Second Department. *See, e.g., King v. Bennett*, No. 02-CV-349Sr, 2007 WL 1017102 at *2 (W.D.N.Y. Mar. 30, 2007).  This Court also rejects that interpretation.

observe the Shi'ite religious holidays of Eid-Ghadeer, Muharram and Ashura and providing Halal food requires a minimal accommodation which would allow the Shi'ite Muslim inmates the ability to properly follow their faith." (Id. ¶ 41).

In opposition to plaintiff's application for injunctive relief, defendants submitted the affidavits of several DOCS officials.  However, these affidavits were prepared in 2005 in connection with a different lawsuit, and do not specifically address all of plaintiff's contentions.  Former DOCS Commissioner Glen Goord indicates, in his affidavit, that the Protocol "was created after more than two years of dialog which included reaching out to major Islamic organizations in New York State," and that it "satisfie[s] the requirements of prior court decisions." (Goord Aff. [#26-1] ¶ ¶ 16, 20) In that regard, Goord indicates that the Protocol does not require separate Sunni and Shi'ite Jumah services.  However, Goord's affidavit does not address plaintiff's contentions that DOCS is violating the Protocol by failing to provide for the observance of Shi'ite holy days.

Defendants also submit the affidavit of Mark Leonard ("Leonard"), DOCS Director of Ministerial and Family Services.  Leonard indicates that "DOCS' accommodation of religious practices has included, but is not limited to, arranging regular and holiday services conducted by an approved religious leader, meeting special dietary needs, allowing religious symbols, allowing religious materials such as Bibles, Quarans, publications, and providing inmates a place to worship as a group." (Leonard Aff. [#27-1] ¶ 7) However, Leonard states that DOCS "does not provide separate worship services for different denominations within a religion," and that "although there are different sects within Islam, DOCS provides for a single generic

6

Jumah for Muslim inmates." (Id. ¶ 8) Leonard also states that one full-time Shi'ite

chaplain is employed by DOCS, though he does not say where this individual is

physically located. (Id. ¶ 13)  Regarding food, Leonard further states:

> All inmates are also allowed to fast when their religious beliefs require
> fasting and may bring back to their cells or eat in a designated area to
> break their fast.  For example, some Muslim inmates may do this during
> Ramadan . . . .  Should inmates' individual beliefs require, inmates are
> also allowed to purchase their own food to conform to their religious
> needs.

(Id. ¶ 23)  However, Leonard does not specifically address plaintiff's contention that

DOCS ignores Shi'ite holy days.

Defendants additionally submit the affidavit of Lucien LeClaire ("LeClaire"),

DOCS Deputy Commissioner for Correctional Facilities.  LeClaire states, *inter alia*, that

providing separate Jumah services for Sunni and Shi'ite inmates would impose "an

untenable administrative and security burden" on DOCS. (LeClaire Aff. [#28-1] ¶ 12)

Leclaire's affidavit, though, is focused on the issue of separate Jumah services, and

does not address plaintiff's allegations regarding the denial of Shi'ite holy day

observances.

Lastly, defendants submit the affidavit of Abdul Mubdi ("Mubdi"), a Muslim

chaplain employed by DOCS.  Mubdi states that he is "a Shi'ite Muslim and a prayer

leader." (Mubdi Aff. [#53-1] ¶ 3) Mubdi's affidavit contends that it is permissible for

Shi'ites to participate in Jumah prayers with Sunnis. (*Id*. ¶ ¶  13, 15), but it does not

address plaintiff's contentions regarding Shi'ite holy days.

On June 15, 2006, the Court held a hearing on plaintiff's application.  Following

that appearance, the Court extended the parties' time to submit additional affidavits to

July 31, 2006.   Subsequently, at the parties' request, the Court extended the deadline

for submitting additional affidavits to September 22, 2006.

ANALYSIS

The standard for considering an application for a preliminary injunction is well

settled:

> In general, to secure a preliminary injunction, the moving party must
> demonstrate: (1) irreparable harm, and (2) either (a) a likelihood of
> success on the merits or (b) sufficiently serious questions going to the
> merits of the case to make it a fair ground for litigation, and a balance of
> hardships tipping decidedly in its favor.  A party moving for a mandatory
> injunction that alters the status quo by commanding a positive act must
> meet a higher standard, however.  That is, in addition to demonstrating
> irreparable harm, the moving party must make a clear or substantial
> showing of a likelihood of success on the merits, a standard especially
> appropriate when a preliminary injunction is sought against government.

*D.D. ex rel. V.D. v. New York City Bd. of Educ.*, 465 F.3d 503, 510 (2d Cir. 2006)

(citations and internal quotations omitted).  Here, it is undisputed that plaintiff must

meet the higher standard. (Pl. Reply Brief [#32] p. 9).

Plaintiff contends that he is entitled to injunctive relief pursuant to both the

RLUIPA and the First Amendment's Free Exercise Clause.[3]  To prevail on a Free

Exercise claim, a plaintiff must show that defendants substantially burdened the

exercise of his religion, for reasons that are not reasonably related to legitimate

penological objectives. *Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006) ("[A]

challenged prison regulation is judged "under a 'reasonableness' test . . . a regulation

---

[3]"The Religion Clauses of the First Amendment provide: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." The first of the two Clauses, commonly called the Establishment Clause, commands a separation of church and state. The second, the Free Exercise Clause, requires government respect for, and noninterference with, the religious beliefs and practices of our Nation's people." *Cutter v. Wilkinson*,  544 U.S. 709, 719, 125 S.Ct. 2113, 2120 (2005).

that burdens a protected right passes constitutional muster if it is reasonably related to legitimate penological interests.") (citation and internal quotation marks omitted).  In that regard,

> [t]he prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs.  The defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational.

*Id*. at 274 -275 (citations and internal quotation marks omitted).  A "substantial burden" is one that "puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *McEachin v. McGuinnis*, 357 F.3d 197, 202 n.4 (2d Cir. 2004) (quoting *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir.1996)).  Further, the "burdened practice need not be mandated by the adherent's religion in order to sustain a prisoner's free exercise claim." *Id*. At 203.  A court must consider four factors In deciding whether the complained-of practice is reasonably related to legitimate penological objectives:

> whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating the right; and the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests.  The first [of these factors] is more properly labeled an "element" because it is not simply a consideration to be weighed but rather an essential requirement.

*Salahuddin v. Goord*, 467 F.3d at 274 (citation omitted).

The RLUIPA, on the other hand, imposes a more exacting standard on prison officials, requiring that any substantial burden on an inmate's exercise of religion be warranted by a "compelling governmental interest," and be the "least restrictive means"

9

of accomplishing that interest:

> Section 3 of the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA or Act), 114 Stat. 804, 42 U.S.C. § 2000cc-1(a)(1)-(2), provides in part: 'No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution,' unless the burden furthers 'a compelling governmental interest," and does so by 'the least restrictive means.'

*Cutter v. Wilkinson*, 544 U.S. 709, 712, 125 S.Ct. 2113, 2116 (2005).[4]  "The Act defines 'religious exercise' to include 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief.'" *Id*., 544 U.S. at 715, 125 S.Ct. at 2118 (citing 42 U.S.C. § 2000cc-5(7)(A))[5].  The 'exercise of religion' "often involves not only belief and profession but the performance of  physical acts such as assembling with others for a worship service or participating in sacramental use of bread and wine." *Id*., 544 U.S. at 720, 125 S.Ct. at 2121 (citation and internal quotation marks omitted).  Significantly, however, in enacting the RLUIPA, and the "compelling governmental interest/least restrictive means" standard, Congress anticipated "that courts entertaining complaints under § 3 would accord due deference to the experience and expertise of prison and jail administrators." *Id*., 544 U.S. at 717, 125 S.Ct. at 2119 (citation and internal quotation marks omitted).

---

[4]"[RLUIPA] Section 3 covers state-run institutions-mental hospitals, prisons, and the like-in which the government exerts a degree of control unparalleled in civilian society and severely disabling to private religious exercise. 42 U.S.C. § 2000cc-1(a)[.] RLUIPA thus protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." *Cutter v. Wilkinson*,  544 U.S. at 720-721, 125 S.Ct. at 2121 - 2122 (citations omitted).

[5]"Section 3 applies when 'the substantial burden [on religious exercise] is imposed in a program or activity that receives Federal financial assistance,' or 'the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes.' § 2000cc-1(b)(1)-(2)." *Cutter v. Wilkinson*, 544 U.S. at 715-716, 125 S.Ct. at 2118 - 2119.  It is undisputed that RLUIPA applies here because DOCS receives federal financial assistance.

Applying these principles of law to the facts of this case, the Court finds, first, that plaintiff is not entitled to injunctive relief requiring DOCS to conduct separate Jumah services.[6]  Defendants contend that DOCS policy of holding joint Sunni-Shi'ite Juman services does not "substantially burden" plaintiff, and that even if it did, that the policy is reasonably related to legitimate penological interests.  (Defendants' brief does not discuss the higher "compelling governmental interest/least restrictive means" standard imposed by the RLUIPA) In support of their position, defendants cite *Orafan v. Goord*, 411 F.Supp.2d 153 (N.D.N.Y. 2006).  In *Orafan*, the court found that a joint Sunni-Shi'ite Jumah service did not substantially burden the Shi'ite plaintiffs' religious beliefs. *Id*. at 159.  However, *Orafan* is distinguishable from the instant case in that regard, because in *Orafan*, the inmate plaintiffs admitted that they attended the joint Jumah services, and they further admitted that they could satisfy their prayer requirements by reciting the prayers alone in their cells. *Id*.  In this case, plaintiff maintains that joint Jumah services are not acceptable to him, and that praying alone is likewise not an acceptable alternative to a congregational Jumah service with fellow Shi'ites. Consequently, *Orafan* does not require this Court to reject plaintiff's contention that his religious beliefs are being substantially burdened.  To the contrary, the Court finds that plaintiff has made the requisite showing of a substantial burden, under both the Free Exercise Clause and the RLUIPA.

On the other hand, however, the Court in *Orafan* also found that defendants had

---

[6]With regard to the standard for obtaining injunctive relief discussed above, defendants' papers seem to contest only the issue of plaintiff's likelihood of success on the merits. *See*, Def. Memo of Law [#25]).  Accordingly, that is the focus of the Court's analysis.

demonstrated a compelling governmental interest in holding a joint Jumah service, and that the joint service was the least restrictive means of achieving that interest. *Orafan v. Goord*, 411 F.Supp.2d at 159-160 ("The compelling government interests asserted are security concerns, fiscal and staffing limitations, and space constraints.  Maintaining security and preserving order are compelling government interests. . . . [T]he policy of holding a unified Jumah service is the least restrictive means to satisfy those interests.").  Here, the Court similarly finds plaintiff has not shown a likelihood of success on the "compelling governmental interest/least restrictive means" issue.  The affidavits of Leonard and LeClaire, in particular, indicate that DOCS has a compelling interest in having a single Jumah service, and that a joint Jumah service is the least restrictive means of accomplishing that interest.  Plaintiff concedes that defendants have a legitimate interest in maintaining security (Pl. Aff. [#31-1] ¶ 24), but he questions whether a joint Jumah service is the least restrictive means.  For example, he suggests that DOCS could hold separate Sunni and Shi'ite Jumah services "at the same time and in close proximity . . . so that the need for additional space and security guards would be obviated." (*Id*. ¶ 25).  Defendants dispute this, though, and the Court is obliged to "accord due deference to the experience and expertise of prison and jail administrators" on this point, particularly in light of the fact that plaintiff has offered no convincing evidence to dispute defendants' affidavits. *Cutter v. Wilkinson*, 544 U.S. at 717, 125 S.Ct. at 2119.  Consequently, plaintiff's application for injunctive relief ordering separate Jumah services is denied.

However, as already discussed, the request for separate Jumah services was only one of three requests made by plaintiff.  As for his other two requests, that DOCS

12

observe the Shi'ite holy days of Eid-Ghadir, Muharram, and Ashura, and that DOCS

provide Halal food to Shi'ites on those holy days, defendants have essentially offered

no opposition.  At most, defendants' memorandum states the following:

> The issue of halal food is without merit.  Plaintiff has the burden of proof
> to show to the Court that the prison diet is insufficient 'to sustain the
> prisoner in good health without violating [his religion's] dietary laws." *Cox
> v. Kralik*, — F.Supp.2d —, (S.D.N.Y. 2006), 2006 U.S. Dist. LEXIS 8765
> [2006 WL 42122 ].

(Def. Memo [#25] p. 5).[7]  The Court disagrees, since plaintiff has indicated that his

religion's dietary laws require the consumption of Halal food on the subject holidays.

Moreover, plaintiff's expert, Dr. Takim, indicates that DOCS should "provide to Shi'ite

inmates Halal food" so that they may "properly follow their faith." (Takim Aff. [#52-1] ¶ ¶

35-36; *see also, Id*. ¶ 41).  Apart from indicating that inmates generally have the ability

"to purchase their own food to conform to their religious beliefs," defendants have

submitted no evidence regarding the type of food that is available to plaintiff.

Therefore, the Court finds that plaintiff's requests for injunctive relief relating to the

Shi'ite holidays of Eid-Ghadir, Muharram, and Ashura, and for Halal food on those

days, should be granted.

The Court notes, as an aside, that it appears from the Protocol discussed above

that DOCS has already agreed to the observance of Ashura, and the Id-ul-Ghadeer

Khum, the latter of which the Court assumes is the same as Eid-Ghadir. (*See*, The

Protocol)("The Department [DOCS] shall revise its Religious Observance Calendar . . .

---

[7]*Cox v. Kralik* is also inapposite because the defendants in that case introduced evidence that they were providing the plaintiff with a diet that was essentially Halal.  In this case, defendants have offered no such evidence.

13

to include observances unique to Shi'ite Muslims, namely the observances of Ashura, and the Id-ul-Ghadeer Khum.") Moreover, it appears from the current record that the provision of Halal food is part and parcel of the observance of Muslim holy days, such that the provision of such food on Shi'ite holy days was intended by the Protocol.  In other words, in the Protocol, DOCS already agreed to allow Shi'ites to observe Ashura and Eid-Ghadir, which includes the provision of Halal food.  Accordingly, the only relief now being ordered by the Court that was not already agreed to by DOCS is the observance of Muharram, which was not mentioned in the Protocol.

CONCLUSION

Plaintiff's application for injunctive relief [#17] is granted in part and denied in part.  The application is denied insofar as it requests separate Jumah services.  The application is otherwise granted, as follows:  Until further Order of this Court, defendants are directed to allow plaintiff to observe the Shi'ite holy days of Eid-Ghadir, Muharram, and Ashura, and to provide plaintiff with Halal food on these religious holidays.

So Ordered.

Dated: Rochester, New York
May 3, 2007

ENTER:


/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge